UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOEZETTE HITE,

       Plaintiff,

v.                            Case No. 8:12-cv-2277-T-33AEP

HILL DERMACEUTICALS, INC.,

       Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Defendant Hill Dermaceuticals, Inc.'s Motion for Summary Judgment (Doc. # 27), filed on November 29, 2013. Plaintiff Joezette Hite filed a response in opposition to the Motion (Doc. # 36) on January 17, 2014. Hill Dermaceuticals filed a reply to Hite's response on January 31, 2014. (Doc. # 37). For the reasons that follow, the Motion is granted.

**I.   Background**

In February of 2004, Hill Dermaceuticals hired Hite to work as a "dermatology sales representative." (Offer Letter Doc. # 27-1 at 1). Hite attended a multi-day orientation as a new employee with Hill Dermaceuticals, during which time Hite received training from Maria Darnell, the executive assistant to Hill Dermaceuticals' founder and president,

Jerry Roth.  (Hite Dep. Doc. # 31 at 4, 6; Roth Dep. Doc. # 29 at 2; Schmidt Dep. Doc. # 28 at 5).  Following her orientation, Hill Dermaceuticals assigned Hite a sales territory on the west coast of Florida spanning from Brooksville to Naples.  (Hite Dep. Doc. # 31 at 7-8).

Hite's work involved visiting customers, specifically dermatology physicians, to offer prescription products for the treatment of conditions such as psoriasis and eczema. (Id. at 8).  According to Hite, Hill Dermaceuticals expected her to call on "about 10 to 12 physicians a day."  (Id. at 7).[1]  Hite primarily sold three products for Hill Dermaceuticals: (1) Derma-Smoothe Scalp, (2) Derma-Smoothe Body, and (3) DermaOtic Ear Drops.  (Id. at 8).  In addition to Hite's fixed salary, Hill Dermaceuticals agreed to pay Hite commissions based on the number of prescriptions written by physicians.  (Id. at 5).

In Hite's original offer letter dated February 6, 2004, Hill Dermaceuticals provided general information regarding Hite's employment, including details relating to vacation leave, health insurance, and the "proprietary and secret

---

[1]According to Hite's direct supervisor, however, the company policy called for "40 to 45 doctors a week."  (Schmidt Dep. Doc. # 28 at 11).

2

nature of Hill's products and programs." (Offer Letter Doc. # 27-1 at 1). That letter contained the following provision: "As a Hill Sales Representative, you agree to represent the Hill product line exclusively and will never solicit business for any similar product or program of any other company and will not help or associate with any other distributor of similar products." (Id. at 2).

During her employment with Hill Dermaceuticals, Hite reported to regional sales manager Elizabeth Schmidt.[2] (Hite Dep. Doc. # 31 at 9; Schmidt Dep. Doc. # 28 at 11). Every week by Saturday at noon, Hite was required to fax to Schmidt a one-page weekly report containing information about her interaction with physicians in the field, including the physician's name, the date, and the location. (Schmidt Dep. Doc. # 28 at 12). At least once per year, Schmidt would ride along with Hite on her sales calls as a form of company training and review. (Hite Dep. Doc. # 31 at 9; Schmidt Dep. Doc. # 28 at 14).

---

[2] In Hite's deposition, the parties refer to Schmidt as "Elizabeth Mark." (See Hite Dep. Doc. # 31 at 3). However, Schmidt explains in her own deposition that Mark is her husband's last name, and that she never changed her name to Mark after marriage. (Schmidt Dep. Doc. # 28 at 2).

On March 22, 2008, Hite gave birth to her first child, Colin. (Hite Dep. Doc. # 31 at 3). Before Colin's birth, while Hite was still pregnant and working, Hite conferred with Schmidt regarding Hite's plans to take time off after the baby was born. (Id. at 12). Schmidt never gave Hite a "time limit" on the appropriate duration for maternity leave, but expressed to Hite during the fourth or fifth week of her maternity leave that Hite was "being missed in the field," and that Hite's "numbers [were] falling as a result." (Id. at 13). Although Hite states that she never specified to Schmidt how much time she wanted to take off, Hite ultimately took "a little less than eight" weeks off from work after Colin's birth. (Id. at 12-13). During the time that Hite was away from work, she did not receive her salary, but received continued employee health care coverage as well as commissions based on the sales from her territory. (Id. at 14; Schmidt Dep. Doc. # 28 at 20).

After taking nearly eight weeks off, Hite returned to work in the same sales territory she had as of March 21, 2008. (Hite Dep. Doc. # 31 at 14). Schmidt accompanied Hite on at least one ride-along when Hite resumed her full-time employment. (Id. at 15-16). Because Hite was still breastfeeding her infant, Hite took breaks while on the road

4

to stop and pump breast milk in her car.  (Id. at 24).  While Hite did so, Schmidt would wait outside the car "on the cell phone taking calls from employees," or wait "in the lobby of one of the physicians" in order to give Hite privacy.  (Id.).

During the summer of 2009, Hite learned that she was pregnant with her second child.  (Id. at 23).  In October of that year, Hite attended a company sales meeting in Orlando, at which Schmidt approached Hite and asked whether Hite was pregnant.  (Id.).  Initially, Hite denied being pregnant, but "after being questioned" by Schmidt, Hite ultimately confirmed that she was indeed pregnant.  (Id. at 24).  Schmidt responded by asking: "Well, did you plan this?"  (Id.).  Hite "told her no," that the pregnancy was not planned.  (Id.).

On March 11, 2010, Hite gave birth to her second child, Evan.  (Id. at 23).  Before Evan was born, Hite did not discuss with Schmidt or anyone else at Hill Dermaceuticals the amount of time she wanted to take off for maternity leave.  (Id. at 26).  Once Hite had given birth, she informed Schmidt that she intended to take eight weeks of maternity leave – the same amount of time Hite had taken after her first pregnancy.  (Id. at 48).  During the fourth or fifth week of Hite's leave, Schmidt called to inform Hite of an upcoming sales meeting.  (Id.).  According to Hite:

> [S]he called me to tell me that there was a sales
> meeting coming up, and that I had two options – she
> knows that I don't like to fly being the fact that
> I have a newborn – that my sales meeting was
> scheduled for Atlanta, but if I chose to come back
> early that she would pull some strings and I could
> go to the managers meeting which would be in
> Orlando.

(Id.).  Hite accepted Schmidt's offer to attend the Orlando
meeting in lieu of the Atlanta meeting in April of 2010.  (Id.
at 48-49).  With the exception of attending this meeting,
Hite remained on leave until May of 2010, when she resumed
her duties as a full-time sales representative.  (Id. at 49-
50).  Upon Hite's return to work, Schmidt again accompanied
Hite on a ride-along, during which Schmidt praised Hite's
performance in the field.  (Id. at 25, 33).

On June 1, 2010, Hite signed an agreement containing
reminders of the details of her employment, including
information relating to the "proprietary and secret nature of
Hill's products and programs."  (Doc. # 27-2 at 1-2).  That
agreement also contained the following provision: "As a Hill
sales representative, you agree to represent the Hill product
line exclusively and to never solicit business for any product
or service of any other company."  (Id. at 2).  Hill
Dermaceuticals issued this document not only to Hite, but to
all employees at that time.  (Kaplan Dep. Doc. # 30 at 6).

6

On October 7-8, 2010, Hill Dermaceuticals held another company sales meeting in Orlando, which Hite and Schmidt both attended. (Hite Dep. Doc. # 31 at 30). Before the start of the meeting, Hite encountered Schmidt at breakfast. (Id.). During that encounter, Schmidt suggested to Hite that she should not leave during the meeting breaks to pump breast milk because "the last time that you left during one of the breaks you came back five minutes late." (Id.). Schmidt also said that Hite potentially could be "berated in front of all the managers" if she left the meeting too many times. (Id.).

Hite testified as follows regarding her response to Schmidt's warning:

> A:  . . . I said, "Regardless, I'm still going to get up." [Schmidt] said, "What's going to happen if you don't get up?" I said, " I'm going to leak all over my dress, Elizabeth." She said, "Well, it's a good thing you have long hair, cover it up." And after that you could say during the meeting my disposition was completely different than it usually is because I was extremely upset.

> Q:  When you say your disposition was completely different, how was your disposition?

> A:  I just sat there. I didn't engage in the conversations. Toward the latter part I was in pain. When you're breast feeding, and if you're not able to express the milk, everything starts balling up inside your breast and it was painful.

(<u>Id.</u> at 31).  Despite this experience, however, Hite did not complain to "anybody else in authority at the company" about the conversation she had with Schmidt.  (<u>Id.</u>).

At the conclusion of the October 2010 sales meeting, Schmidt expressed concern to Hite that it appeared Hite had not been paying attention during the meeting, and that Hite's eyes appeared to be "glazed over."  (<u>Id.</u> at 32).  Schmidt also commented that Hite's sales numbers had dropped.  (<u>Id.</u>).

In early November of 2010, Schmidt and Hill Dermaceuticals' national sales manager Howard Kaplan called Hite to discuss her future with the company.  (<u>Id.</u> at 37). Due to Hite's declining sales numbers, Schmidt and Kaplan offered Hite the choice of either (1) agreeing to a sixty-day probationary period or (2) resigning, signing a release, and receiving six weeks of severance pay.  (<u>Id.</u>).  Hite requested time to speak with her husband about these options, and Schmidt and Kaplan agreed that Hite could respond the following Monday.  (<u>Id.</u> at 38).

After speaking with her husband, Hite decided to seek counsel.  (<u>Id.</u>).  On Monday, November 8, 2010, Hite left a message with Schmidt explaining that she was ill and would not be able to come in to work.  (<u>Id.</u>).  However, Hite admits

that she was not really sick; she used the day off to meet with a lawyer. (Id.).

Also in early November of 2010, Kaplan discovered that, since October 5, 2010 (Hite Dep. Doc. # 31 at 56), Hite had owned a business called "Crave Nail Spa." (Kaplan Dep. Doc. # 30 at 4-5). Kaplan informed Schmidt of the Crave website, and on November 10, 2010, Schmidt had a telephone conversation with Kaplan and counsel for Hill Dermaceuticals. (Schmidt Dep. Doc. # 28 at 24). Kaplan also discussed his discovery of the Crave website with Hill Dermaceuticals president Jerry Roth, and during that discussion they jointly concluded that the contents of the website constituted "solicitation for a business that was being done in violation of [Hite's employee] agreement. Also, products were represented which were competitive and there was disparaging or critical remarks publicly made of some of the ingredients in the Hill Dermaceuticals products which Ms. Hite represented to her physicians." (Kaplan Dep. Doc. # 30 at 8).

Hite acknowledges that her website for Crave Nail Spa advertised its use of products free of parabens – a preservative found in products sold by Hill Dermaceuticals. (Hite Dep. Doc. # 31 at 39). Specifically, Hite confirms that the website provided as follows: "Why say no to parabens?

9

Parabens are used frequently in personal care products to increase shelf-life of a product. According to scientific research, parabens have been linked to breast cancer and problems associated with reproductive issues." (Id. at 73). Hite also admits that she was aware in November of 2010 that Hill Dermaceuticals sold products containing parabens. (Id. at 39).

On Wednesday, November 10, 2010, Hite advised Schmidt that she would prefer to continue her employment under the terms of the sixty-day probationary period. (Hite Dep. Doc. # at 39, 40). However, Schmidt informed Hite that this option was no longer available, and that Hill Dermaceuticals was instead terminating her employment immediately because Hite owned a company offering products that competed with Hill Dermaceuticals. (Id. at 39; Schmidt Dep. Doc. # 28 at 32).

On October 5, 2012, Hite filed the instant action alleging gender discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq., and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01, et seq. (Count I); pregnancy discrimination in violation of Title VII and the FCRA (Count II); and violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq. (Count III). On November 29, 2013, Hill Dermaceuticals filed the instant Motion for

Summary Judgment.  (Doc. # 27).  Hite filed a response in opposition to the Motion (Doc. # 36) on January 17, 2014. Hill Dermaceuticals filed a reply to Hite's response on January 31, 2014.  (Doc. # 37).  The Court has reviewed the Motion, the response, the reply, and all relevant exhibits, and is otherwise fully advised in the premises.

## II.  __Legal Standard__

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of

showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855,

856 (11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981), <u>cert.</u> <u>denied</u>, 456 U.S. 1010 (1982).

## III. <u>Discussion</u>

### A. <u>Gender and Pregnancy Discrimination (Counts I and II)</u>

In Count I, Hite alleges a claim for gender discrimination in violation of Title VII and the FCRA.  In Count II, Hite alleges a claim for pregnancy discrimination in violation of Title VII and the FCRA.  Pursuant to Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  The Pregnancy Discrimination Act amended Title VII by providing that the prohibition against employment-related discrimination "on the basis of sex" includes discrimination based on pregnancy, childbirth, or related medical conditions.  <u>Armstrong v. Flowers Hosp., Inc.</u>, 33 F.3d 1308, 1312 (11th Cir. 1994).

The analysis applied in pregnancy discrimination cases is the same as the analysis applied in other Title VII sex discrimination cases. Id. at 1312-13. Furthermore, "decisions construing Title VII guide the analysis of claims under the Florida Civil Rights Act." Slater v. Energy Servs. Grp. Int'l, Inc., 441 F. App'x 637, 640 (11th Cir. 2011) (citing Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1389 (11th Cir. 1998)); see also Gamboa v. Am. Airlines, 170 F. App'x 610, 612 (11th Cir. 2006) (stating that claims under Title VII and the FCRA are analyzed under the same framework).

Some courts have debated whether the FCRA provides a cause of action for pregnancy discrimination. Compare DuChateau v. Camp Dresser & McKee, Inc., 822 F. Supp. 2d 1325 (S.D. Fla. 2011) (finding that the FCRA does not prohibit pregnancy discrimination), and Boone v. Total Renal Labs., Inc., 565 F. Supp. 2d 1323 (M.D. Fla. 2008) (finding that the FCRA does not provide a cause of action for pregnancy discrimination), with Terry v. Real Talent, Inc., No. 8:09-cv-1756-T-30TBM, 2009 WL 3494476 (M.D. Fla. Oct. 27, 2009) (finding that the FCRA does provide a cause of action for pregnancy discrimination), and Carsillo v. City of Lake Worth, 995 So. 2d 1118 (Fla. 4th DCA 2008) (finding that the FCRA's prohibition of sex discrimination includes discrimination

14

based on pregnancy). Without reaching the issue of whether the FCRA does provide for such a cause of action, Hite's FCRA claims would be covered by the Court's analysis of Hite's pregnancy discrimination claims brought under Title VII. Accordingly, the Court's analysis below applies to both Counts I and II.

It is well settled that "there are two types of discrimination actionable under Title VII": disparate treatment and disparate impact.  Armstrong, 33 F.3d at 1313. In this case, Hite alleges only a disparate treatment claim. A plaintiff may employ one of three means to establish a prima facie case of disparate treatment employment discrimination: (1) direct evidence of discriminatory intent, (2) statistical analysis evidencing a pattern of discrimination, or (3) circumstantial evidence meeting the test established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Verbraecken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).  Hite has offered neither statistical analysis evidencing a pattern of discrimination nor direct evidence of discriminatory intent.  Therefore, the Court will proceed to evaluate Hite's claims pursuant to the analytical framework established in McDonnell Douglas.

## 1.  Circumstantial Evidence

In analyzing allegations supported by circumstantial evidence under Title VII, the Court follows the burden-shifting analysis established in McDonnell Douglas and its progeny. See Gamboa v. Am. Airlines, 170 F. App'x 610, 612 (11th Cir. 2006)(citing Harper, 139 F.3d at 1387). Under the McDonnell Douglas framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination against the defendant.  McDonnell Douglas, 411 U.S. at 802. If the plaintiff successfully establishes a prima facie case, a rebuttable presumption of discrimination is created and the burden of proof then shifts to the defendant. Id. at 802-03; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006)(citing EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1272 (11th Cir. 2000)).

To rebut the presumption created by a plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998).  However, "[t]his is a burden of production, not persuasion." Standard, 161 F.3d at 1331. "[The defendant] must merely produce

evidence that could allow a rational fact finder to conclude"
its actions were not motivated by discriminatory animus. Id.

If the defendant produces such evidence, the burden
shifts back to the plaintiff. McDonnell Douglas, 411 U.S. at
802-03. The plaintiff then "has the opportunity to come
forward with evidence, including the previously produced
evidence establishing her prima facie case, sufficient to
permit a reasonable factfinder to conclude that the reasons
given by the employer were not the real reasons for the
adverse employment decision." Combs v. Plantation Patterns,
106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted).
However, "[a] legitimate nondiscriminatory reason proffered
by the employer is not a pretext for prohibited conduct unless
it is shown that the reason was false and that the real reason
was impermissible retaliation or discrimination." Worley v.
City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011).

### a. **Prima Facie Case**

In its Motion for Summary Judgment, Hill Dermaceuticals
argues that Hite cannot establish a prima facie case of
discrimination. In so arguing, Hill Dermaceuticals relies on
the prima facie elements enumerated in Crawford v. Carroll,
529 F.3d 961, 970 (11th Cir. 2008), a case involving claims

of racial discrimination and retaliation under Title VII.[3] According to Crawford, "[t]o make out a prima facie case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." Crawford, 529 F.3d at 970. Accordingly, although Hill Dermaceuticals "does not contest that Plaintiff satisfies the first three elements," Hill Dermaceuticals contends that Hite cannot establish a prima facie case because "she cannot establish the existence of any similarly situated employees outside of [her] protected class whom Defendant treated more favorably." (Doc. # 27 at 12).

In response, Hite argues that, "[i]n discharge cases, a plaintiff can establish a prima facie case without comparator evidence," and cites to Cooper-Houston v. Southern Ry. Co., 37 F.3d 603 (11th Cir. 1994), another racial discrimination action under Title VII, to support this proposition. Specifically, Hite directs the Court's attention to the

---

[3] More specifically, Hill Dermaceuticals relies on Spence v. BHTT Entm't, Inc., No. 8:12-cv-694-T-33MAP, 2013 WL 3714016, at *5 (M.D. Fla. July 15, 2013), another case involving racial discrimination claims, in which this Court relied upon the prima facie elements enumerated in Crawford, 529 F.3d at 970.

portion of the <u>Cooper-Houston</u> opinion finding that the plaintiff had established a prima facie case of discrimination "by setting forth evidence that she is black, that she was qualified for the job, that she was terminated and that she was replaced by a white person." <u>Cooper-Houston</u>, 37 F.3d at 605.  In so finding, the Eleventh Circuit explained:

> Southern argues that Cooper-Houston failed to make
> out a prima facie case.  It contends that she had
> to demonstrate either she did not violate the work
> rule, or that employees outside of the protected
> class that engaged in similar misconduct were
> treated with less severity, citing <u>Jones v.
> Gerwens</u>, 874 F.2d 1534, 1539-40 (11th Cir. 1989).
> The holding in <u>Jones</u>, however, applies only to Title
> VII cases in which a plaintiff has not been
> terminated and therefore cannot show that he or she
> was replaced by a person outside of the protected
> class.

<u>Id.</u> at 605 n.4.  The Court finds this explanation largely unhelpful, however, because Hite does not attempt to demonstrate that she was "replaced by a person outside of the protected class."

Hite additionally argues:

> Because a "prima facie case is not wholly
> dependent upon meeting the fourth requirement of
> the McDonnell Douglas test," <u>Edwards v. Wallace
> Community College</u>, 49 F.3d 1517, 1521 (11th Cir.
> 1995), the fourth element may be met with proof
> that "a person outside of the class with equal or
> lesser qualifications was retained."  <u>See Lee v.
> Russell County Board of Education</u>, 684 F.2d 769,
> 773 (11th Cir. 1982).

19

> The Supreme Court has stated that a prima facie case of sex discrimination requires the following: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and, (4) the position remained open or was filled by a person with similar qualifications.  See <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 510 (2002).

(Doc. # 36 at 8).   However, despite Hite's urging that the fourth element of her prima facie case should be based on the characteristics of the person hired to replace Hite after her termination, Hite has not directed the Court to any evidence in the record showing that this alternate fourth element was indeed satisfied in this case.  Absent a citation to specific record evidence, "[t]his court is under no obligation to plumb the record in order to find a genuine issue of material fact." <u>Bender v. City of Clearwater</u>, No. 8:04-cv-1929-T23EAJ, 2006 WL 1046944, at *17 (M.D. Fla. Apr. 19, 2006).

Thus, even if the Court agreed that Hite need not identify a comparator to establish her prima facie case of discrimination, the Court nonetheless finds that Hite has failed to establish a prima facie case under Hite's own proposed alternate theory that Hite's position was filled by a person with lesser or similar qualifications.

Furthermore, the Court notes that – curiously – neither party attempts to utilize the fourth element frequently

applied by the Eleventh Circuit in pregnancy discrimination cases. For example, in Sampath v. Immucor, Inc., 271 F. App'x 955 (11th Cir. 2008), a case involving a plaintiff's claim of pregnancy discrimination under Title VII, the Eleventh Circuit explained that, in order to establish a prima facie case, the plaintiff must show that she "(1) was a member of a protected class, (2) was qualified for the job she held, (3) suffered an adverse employment action, and (4) suffered from a different application of work or disciplinary rules." Sampath, 271 F. App'x at 960 n.5 (citing Spivey v. Beverly Enterps., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999) (applying the same elements in a pregnancy discrimination case)); see also Hubbard v. Meritage Homes of Fla., Inc., 520 F. App'x 859, 863 (11th Cir. 2013) (enumerating the same four factors for establishing a prima facie case of pregnancy discrimination, but additionally explaining that "when [a] plaintiff alleges discriminatory discipline, the plaintiff must show that the employer treated similarly situated employees not of the protected class more favorably"). However, even if the Court were to apply this alternate fourth element in the present action, the Court finds that Hite would still fail to establish a prima facie case, as Hite has offered no argument or authority to support the proposition

that Hite "suffered from a different application of work or disciplinary rules" while employed by Hill Dermaceuticals.

Thus, because Hite has failed to establish a prima facie case by demonstrating either (1) that her employer treated similarly situated employees outside her class more favorably, (2) that a person outside her class with equal or lesser qualifications was retained for the position after Hite's termination, or (3) that she suffered from a different application of work or disciplinary rules, the Court finds that Hite has failed to demonstrate a prima facie case of gender or pregnancy discrimination.

### b.    Legitimate, Nondiscriminatory Reasons for Termination; Pretext

For the sake of thoroughness, the Court will address Hill Dermaceuticals' proffered legitimate, nondiscriminatory reasons for terminating Hite just as if Hite had successfully established her prima facie case.  Hill Dermaceuticals offers the following legitimate, nondiscriminatory reasons for Hite's termination: "Plaintiff's operation of a side business with potentially competitive products, her website's disparaging accusations about the ingredients in Hill's products, and Plaintiff's promotion of her business on local news shows during what should have been her regular work day

for [Hill Dermaceuticals] . . . ." (Doc. # 27 at 15). Indeed, Schmidt, Kaplan, and Roth each testified that these were the reasons behind Hite's termination. (Schmidt Dep. Doc. # 28 at 32; Kaplan Dep. Doc. # 30 at 10; Roth Dep. Doc. # 29 at 9). Furthermore, Hite confirmed that these were the reasons given for her termination. (Hite Dep. Doc. # 31 at 42, 56, 59).

Hite additionally testified that she owned a nail salon, that she "was the face of it," that she "refer[s] to [her]self as a manager" of it, and that she promoted the salon in an interview with a local television station on October 15, 2010 – a regular workday for Hill Dermaceuticals. (Hite Dep. Doc. # 31 at 29, 69-70, 72). Furthermore, Hite confirmed that the Crave Nail Spa website contained information critical of "parabens," an ingredient she knew existed in Hill Dermaceuticals' products, and that Hite herself approved that language for use on the website. (Id. at 39, 73). Thus, Hite does not dispute the truth of the facts underlying Hill Dermaceuticals' reasons for her termination.

However, even if Hite did dispute these facts, "[t]he law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate

treatment by showing that it honestly believed the employee committed the violation." Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989). The law does not require a defendant to go to all possible lengths to rule out misconduct prior to terminating an employee for such conduct; rather, a defendant must have undertaken only sufficient efforts to form an honest belief that the plaintiff engaged in the conduct. A termination based on a good faith belief of misconduct is legitimate, even if it is later determined that no misconduct occurred. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").

In keeping with this principle, therefore, Hill Dermaceuticals need not prove that its interpretation of Hite's agreement is correct; it is enough that Hite's superiors – Schmidt, Kaplan, and Roth – collectively determined in good faith that Hite's operation of Crave Nail Spa constituted a violation of her agreement "to never solicit business for any product or service of any other company." (Doc. # 27-2 at 2).

24

"Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (evaluating a discrimination claim under the Age Discrimination in Employment Act) (internal quotation marks omitted).

Hite has offered no evidence to show that Hill Dermaceuticals' justification for her termination is unworthy of credence. Hill Dermaceuticals perceived Hite's ownership of a nail salon to be a violation of her agreement. Not only did Hite solicit business for the products and services of another company – Crave – but she did so by participating in a television interview during a regular workday for Hill Dermaceuticals. Furthermore, Crave's website, the content of which Hite admittedly approved (Hite Dep. Doc. # 31 at 73), contained information which Hite's superiors perceived to disparage Hill Dermaceuticals' products.

Hite does not dispute the truth of this information, but instead urges the Court to find that the "clear intent" of

the language of the 2004 offer letter and the 2010 reaffirmation letter "was to preclude Plaintiff from recommending products from other companies to the same physicians she saw in her capacity as a sales representative for Defendant." (Doc. # 36 at 11). In this action, however, the Court is not tasked with definitively interpreting the meaning of the relevant agreement; rather, as explained above, the Court's inquiry is limited to whether Hill Dermaceuticals gave an honest explanation of its behavior. Thus, Hite's argument that "[c]learly, Plaintiff's nail salon sells a service to different customers," is misplaced. (Doc. # 36 at 11). The Court need not determine the intent of the parties in entering this agreement, but need only find that the interpretation offered by Hill Dermaceuticals is consistent with a good faith belief that Hite's actions constituted a violation of the work rule. The Court finds so here.

Similarly, Hite's argument that "a jury can find that Defendant was really grasping at straws in search of a credible reason to terminate a long-term successful employee," (Doc. # 36 at 13) is immaterial to the Court's present analysis. A plaintiff cannot establish pretext by "recast[ing] an employer's proffered nondiscriminatory reasons or substitut[ing] [her] business judgment for that of

the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. Al Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

Hite also attempts to demonstrate pretext by arguing that "Defendant knew of the Plaintiff's nail salon on November 2, 2010, two full days before November 4, 2010, when Plaintiff was asked to resign based on her numbers.  The jury may find the side business rationale [ ] to be a strategic afterthought once Plaintiff did not immediately resign on November 4, 2010."  (Doc. # 36 at 13).  Again, this argument fails to demonstrate that Hill Dermaceuticals' proffered reasons for Hite's termination were false, and that discrimination was the true reason.  As Hill Dermaceuticals argues, "Hill does not deny that it had concerns about Plaintiff's job performance around the same time that it discovered her competing side business."  (Doc. # 37 at 6).  Both Hite and Schmidt testified that Schmidt had expressed concern in October of 2010 about Hite's sales figures. (Hite Dep. Doc. # 31 at 32; Schmidt Dep. Doc. # 28 at 24).

However, the decline in Hite's sales figures, which led Hill Dermaceuticals to offer Hite a choice between placement

on a sixty-day probationary period or resignation in return for severance pay, was never the reason cited for Hite's termination. The Court notes that, even if Hill Dermaceuticals had offered the declining sales figures as a reason for Hite's termination, this would not constitute evidence tending to show that discrimination was the real reason for Hite's termination, but instead would constitute yet another legitimate, nondiscriminatory reason for terminating Hite.[4]

Both Schmidt and Kaplan testified that, after discovering Hite's side business, they took the time to seek the advice of counsel and to consult with Roth about what action they should take on behalf of the company. (Schmidt Dep. Doc. # 28 at 24; Kaplan Dep. Doc. # 30 at 8). After this collaborative discussion, Hill Dermaceuticals opted to terminate Hite immediately. The fact that this process overlapped with the company's offer to Hite regarding probationary status or resignation due to her poor job

---

[4] The Court acknowledges Hite's argument that "[a] jury can find that Defendant's shifting reasons for desiring to separate Plaintiff from employment are pretextual." (Doc. # 36 at 14). However, the Court finds this argument inapposite here, where the evidence reflects that Hill Dermaceuticals has consistently given a single explanation for Hite's termination – her operation of Crave Nail Spa. (Schmidt Dep. Doc. # 28 at 32; Kaplan Dep. Doc. # 30 at 10; Roth Dep. Doc. # 29 at 9; Hite Dep. Doc. # 31 at 42, 56, 59).

performance does not diminish the legitimacy of Hill Dermaceuticals' reasoning for Hite's ultimate termination.

Importantly, this case is marked with a lack of evidence demonstrating that Hill Dermaceuticals discriminated against Hite on the basis of her gender or her pregnancy. Negative comments by a supervisor regarding pregnant celebrities (Hite Dep. Doc. # 31 at 43-44) or comments expressing one's personal aversion to becoming pregnant (id. at 43) may be unprofessional, insensitive, or perhaps even rude, but such comments, without more, do not constitute illegal discrimination under Title VII.

The Court is mindful that, in addition to these comments, Hite felt that Schmidt had discriminated against her in October of 2010 when Schmidt and Hite discussed Hite's need to pump breast milk during the sales meeting. However, the Court finds that this encounter too falls short of prohibited discrimination. Even in Hite's version of the events, Hite claims that Schmidt "suggested" that Hite not leave during the breaks, and that Schmidt compared Hite's condition to an employee who "had stomach issues and had to keep on going up to use the restroom," which resulted in that employee being "berated in front of all the managers." (Hite Dep. Doc. # 31 at 30). Even if Schmidt indeed responded to Hite's concern

that she would "leak all over [her] dress" with the callous remark: "Well, it's a good thing you have long hair, cover it up," (id. at 31) – an occurrence that Schmidt denies altogether (Schmidt Dep. Doc. # 28 at 23) – such insensitivity falls short of precluding the entry of summary judgment for Hill Dermaceuticals in this case.

The Court finds that the reasons enumerated by Hill Dermaceuticals for terminating Hite constitute legitimate, nondiscriminatory reasons for termination.  Furthermore, the Court finds that Hite has not carried her burden of demonstrating that these reasons are false and that discrimination is the true cause of her termination.

**B.**   **Family and Medical Leave Act (Count III)**

In Count III of the Complaint, Hite alleged that Hill Dermaceuticals violated the FMLA by "harass[ing] Plaintiff to shorten her maternity leave in early 2010, threatening her position," and by "terminat[ing] Plaintiff on November 11, 2010." (Doc. # 1 at 5).  The FMLA provides, in relevant part:

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(1)-(2). Generally, claims based on violations of the FMLA "may be brought . . . no later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). This two-year statute of limitations is extended to three years for claims brought "for a willful violation." Id. § 2617(c)(2).

On January 8, 2013, this Court entered an Order denying Hill Dermaceuticals' partial motion to dismiss as untimely Hite's FMLA claim. (Doc. # 9). Within that Order, the Court determined that the two-year limitations period applied to this action, and further reasoned as follows:

> To support its statute-of-limitations argument, Defendant refers to the incidents alleged in Hite's Complaint that purportedly occurred before October 5, 2010 – exactly two years before Hite filed this action. Although Hite's Complaint indicates that some of Defendant's alleged actions, including pressuring Hite to return to work early during her maternity leave . . . occurred before October 5, 2010, Hite maintains that her termination date falls within the two-year limitations period, and thus that her FMLA claim should survive the motion to dismiss . . . . The Court agrees.

*     *     *

Accordingly, Hite's opportunity to state a claim for any violation of the FMLA based entirely on independent events occurring before October 5, 2010, has expired.

However, accepting as true all factual allegations in the Complaint and construing the facts in the light most favorable to Hite, the Court concludes at this juncture that the "last event" for purposes of interpreting the FMLA's statute of limitations was Hite's termination on November 11, 2010 . . . .   While the Court acknowledges Defendant's argument that "Plaintiff does not allege that her termination was related to conduct protected by the FMLA," a more in-depth inquiry relating to the causal link between Hite's termination and her protected activity under the FMLA is reserved for the summary judgment stage . . . .

(Doc. # 9 at 7-8).  Hill Dermaceuticals now moves for summary judgment on Hite's FMLA claims, once again arguing that, based on the factual allegations within the Complaint, "it is clear that any such violation of the FMLA would have occurred, at the very latest, in April or May of 2010," more than two years before Hite initiated this action.   (Doc. # 27 at 20).

In response to Hill Dermaceuticals' Motion for Summary Judgment, Hite argues that "willful violations are at issue." (Doc. # 36 at 15).   To the extent Hite intends to argue at this juncture that the three-year rather than the two-year statute of limitations should apply in this case, the Court finds this argument ill-timed.   Indeed, the Court noted in its January 8, 2013, Order:

> The Court agrees that Hite has not attempted to allege that Defendant's violations were willful; Hite's Complaint is devoid of any allegation that Defendant knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute. . . . Furthermore, in her response to Defendant's motion to dismiss, Hite did not dispute the lack of any allegation in the Complaint pertaining to Defendant's willfulness or otherwise indicate that anything but the two-year limitations period should apply.

(Doc. # 9 at 6).

Furthermore, Hite's response to the present Motion does not clearly argue that the three-year statute of limitations period should apply. Rather, it arrays a scattershot collection of Hill Dermaceuticals' alleged violations of the FMLA, some of which lack citation to the record for support. (Doc. # 36 at 15). These violations include Hill Dermaceuticals' purported failure to include an "FMLA policy in its Information Handbook published in 2008," Hill Dermaceuticals' "blatantly illegal" maternity leave policy which allowed "only up to 6 weeks of leave," and the allegation that Hite "was incorrectly told by Schmidt that Defendant did not offer maternity leave." (Id.).

With regard to these arguments concerning the notice of FMLA policies provided by Hill Dermaceuticals to its employees, Hill Dermaceuticals argues: "[I]t is well settled that an employee has no private right of action for a

33

violation of FMLA's notice requirement found at 29 U.S.C. § 2619." (Doc. # 37 at 8-9) (quoting Deily v. Waste Mgmt. of Allentown, 118 F. Supp. 2d 539, 544 (E.D. Pa. 2000)).

Without analyzing whether Hill Dermaceuticals has complied with the FMLA notice requirement, the Court finds that, even if such a private right of action did exist, any new cause of action Hite may intend to raise at this juncture as a result of these perceived violations would be inappropriate, as Hite neglected to allege any such violation in her Complaint. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314 (11th Cir. 2004) ("[T]he Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage."). Accordingly, the Court will proceed to evaluate the FMLA claims properly grounded in the allegations of Hite's Complaint.

### 1. **FMLA Interference**

Regardless of whether the three-year or two-year limitations period applies in this case, the Court finds that summary judgment for Hill Dermaceuticals is appropriate on Hite's FMLA interference claim, to the extent Hite may have

34

intended to raise one.   In response to the Summary Judgment Motion, Hite, who is represented by counsel, does not attempt to demonstrate a case of FMLA interference, failing to cite any authority whatsoever to support such a claim.

To prove FMLA interference, a plaintiff must demonstrate that she was "denied a benefit to which [she] was entitled under the FMLA." Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008).   To the extent Hite argues that Hill Dermaceuticals denied her the benefit of maternity leave in 2010, Hite's own testimony belies such a claim.   In response to questioning regarding Hite's experience with Hill Dermaceuticals during the relevant period, Hite testified as follows:

> Q:   When your second son was born, did you inform the company that you were going to take eight weeks of leave?
>
> A:   Yes, that I was - I said I was going to take about the same amount of time I took off with Colin.
>
> Q:   Your recollection was eight weeks?
>
> A:   Correct.
>
> Q:   Who did you tell that you wanted to take the same amount of time?
>
> A:   To Elizabeth.
>
> Q:   What was her response?

A:      Initially she was fine with it.

Q:      Okay.   And at some point in time did that change?

A:      Yes. . . . When she called me to tell me that there was a sales meeting coming up, and that I had two options – she knows that I don't like to fly being the fact that I have a newborn – that my sales meeting was scheduled for Atlanta, but if I chose to come back early that she would pull some strings and I could go to the managers meeting which would be in Orlando.

Q:      Okay.   And when was that meeting scheduled to occur?

A:      Four or five weeks – I believe I came out of maternity leave with him after four or five weeks.

Q:      Your understanding is that this sales meeting that was now going to be a managers meeting that would be in Orlando, so you could drive, that was going to be five weeks after you had your second baby?

A:      Yes.

Q:      You accepted?

A:      Yes.

Q:      Did you appreciate at all that she had pulled some strings so you could go to a meeting where you wouldn't have to fly?

A:      No, because to be honest, I was doing more of the favor.   I was coming back early regardless of the eight-week mark.   To throw that on me – I was basically told that I had to go to Atlanta one, which I didn't really have to go anywhere.   I wasn't appreciative of it, no.   I felt forced.

Q:   I want us to try to be precise in our language.
     You just said I was kind of told that I had to
     be there.  Were you told that you had to be
     there?

A:   I wasn't told I had to be there, I was given
     two options.

                    *     *     *

Q:   You didn't tell her, "I'm still on leave"?

A:   No.

Q:   You didn't tell her, "Remember, we discussed
     and agreed that I would have eight weeks"?

A:   Well, that was the understanding, if I came
     out of the eight weeks it would be Atlanta.

Q:   Okay, so the meeting, if you had gone at eight
     weeks, would have been in Atlanta?

A:   Correct.

                    *     *     *

Q:   Well, let me ask you this: If you knew that
     you were coming back in eight weeks and the
     meeting was in Atlanta, would you have gone?

A:   Probably not.

Q:   So you would have asked for more time?

A:   Correct.

Q:   But you never asked for more time?

A:   No.

(Hite Dep. Doc. # 31 at 48-49).  Accordingly, Hite's testimony

does not establish that Hite was denied a right to which she

was entitled under the FMLA.  Hite testified that she
requested eight weeks of leave, and that she would have
experienced an uninterrupted eight weeks of leave had she
opted to attend the company meeting in Atlanta.  Indeed, Hite
testified that she could have taken her full eight weeks of
leave and then, upon returning, she presumes she could have
taken additional time off instead of attending the Atlanta
meeting.  However, Hite never asked for more time off, and
instead accepted Schmidt's offer to attend the Orlando
conference even though it occurred less than eight weeks after
Hite had given birth.  Under these circumstances, the Court
finds that Hite has failed to demonstrate that she was denied
a benefit to which she was entitled under the FMLA, even if
the Court were to consider this claim to be timely filed.

### 2.  **FMLA Retaliation**

Hite separately argues that she has established a prima
facie case of FMLA retaliation.  (Doc. # 36 at 16).  Where,
as here, a plaintiff alleges an FMLA retaliation claim without
direct evidence of the employer's retaliatory intent, the
Court must once again apply the burden shifting framework
established by the Supreme Court in McDonnell Douglas.  See
Hurlbert v. St. Mary's Health Care Syst., Inc., 439 F.3d 1286,
1297 (11th Cir. 2006).  In order to prove a prima facie case

38

of FMLA retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) she experienced an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. Id. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010). "If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." Hurlbert, 439 F.3d at 1297. "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Id. In this action, Hite cannot establish a prima facie case because she has failed to provide evidence demonstrating the third element – causation.

The time between Hite's maternity leave from March through May of 2010 and her termination in November of 2010 amounts to more than six months. "Although close temporal proximity can indicate causation, the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie

case uniformly hold that the temporal proximity must be 'very close.'" Nichols v. CSG Sys., Inc., 245 F. App'x 937, 941 (11th Cir. 2007) (internal quotations omitted).  The Eleventh Circuit has held that "in the absence of any other evidence of causation, a three-month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." Id. (internal quotations omitted).

Hite argues that "[c]ourts have routinely held that a causal connection exists even as to retaliatory acts occurring long after the protected activity, where those events are temporally linked by a chain of intervening retaliatory acts." (Doc. # 36 at 17).  However, Hite does not proceed to support this argument with evidence showing a chain of retaliatory acts linking her FMLA leave from March through May of 2010 with her subsequent termination in November of 2010. Accordingly, because the Court finds that the span of more than six months between Hite's protected maternity leave and her subsequent termination does not alone demonstrate causation by temporal proximity, and because the Court finds no "chain of intervening retaliatory acts" linking the protected activity and the adverse employment action alleged

in this case, the Court finds that Hite has failed to establish a prima facie case of FMLA retaliation.

However, even if this Court were to presume for the purpose of the present analysis that Hite had demonstrated a prima facie case of retaliation, the burden under the McDonnell Douglas analysis would shift to Hill Dermaceuticals to articulate a legitimate reason for Hite's termination. As discussed previously, this Court finds Hill Dermaceuticals' articulated reason for Hite's termination, namely, that Hite operated and solicited business for the products and services of another company – Crave Nail Spa – to constitute a legitimate, non-retaliatory reason for Hite's termination, and that Hite has failed to demonstrate that this reason is pretextual. Thus, the Court grants Hill Dermaceuticals' Motion for Summary Judgment as to Hite's FMLA claims.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Defendant Hill Dermaceuticals, Inc.'s Motion for Summary Judgment (Doc. # 27) is **GRANTED**.

(2) The Clerk is directed to enter Judgment in favor of Defendant and against Plaintiff and thereafter to **CLOSE THIS CASE**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 25th day of February, 2014.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record